Electronically Filed
Supreme Court
SCWC-13-0000132
15-JUN-2017
08:18 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

RAINIER ACACIO,
Petitioner/Defendant-Appellant.

SCWC-13-0000132

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000132; CR. NO. 12-1-0049)

JUNE 15, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

## I.  INTRODUCTION

Respondent/Plaintiff-Appellee the State of Hawaiʻi (the State) charged Petitioner/Defendant-Appellant Rainier Acacio (Acacio) with offenses arising from a domestic dispute between

Acacio and his ex-girlfriend, the complaining witness (CW). The jury found Acacio guilty of one of the offenses - terroristic threatening in the first degree - and the Circuit Court of the First Circuit (circuit court) entered a judgment of conviction and probation sentence, which the Intermediate Court of Appeals (ICA) affirmed.

In his application for writ of certiorari, Acacio takes issue, inter alia, with the circuit court's decision to limit the CW's testimony on cross-examination. In brief, defense counsel asked the CW questions regarding her knowledge of Acacio's immigration status and whether the CW knew that Acacio could face deportation if he was arrested. The State objected. Despite defense counsel's argument that this line of questioning was imperative in order to establish the CW's bias or motive, the circuit court sustained the State's objection and struck the questions and responses from the record.

We conclude that Acacio was deprived of his right to confront and cross-examine the complaining witness as to her bias and motive. Testimony derived from the CW's answers to the immigration questions might have illuminated the CW's motive for calling the police, and ultimately had the potential to affect her credibility as a witness. Accordingly, we vacate the ICA's September 9, 2016 judgment on appeal, vacate the circuit court's

2

February 4, 2013 judgment of conviction and probation sentence, and remand this case to the circuit court for a new trial.

## II. BACKGROUND

### A. Circuit Court Proceedings[1]

On January 11, 2012, the State charged Acacio with: 1) one count of terroristic threatening in the first degree, in violation of Hawaiʻi Revised Statutes (HRS) § 707-716(1)(e), for threatening "to cause bodily injury to [the CW], with the use of a dangerous instrument, in reckless disregard of the risk of terrorizing [the CW]"; and 2) one count of abuse of family or household members, in violation of HRS § 709-906(1) and (5), for "intentionally, knowingly, or recklessly physically abus[ing] [the CW.]"

The jury trial began on November 16, 2012. On direct examination, the CW testified that Acacio was her live-in boyfriend just prior to the time of the January 1, 2012 incident, and that they had been together for almost two and a half years. The CW explained that in December of 2011, she broke up with Acacio, but that he continued to live in her house until the incident on January 1, 2012.

The CW gave the following testimony about the incident that led to Acacio's arrest:

---

[1]    The Honorable Edward H. Kubo, Jr. presided.

On the night of December 31, 2011, the CW's family had a New Year's party at their house.  The CW was outside, enjoying the party with her family, while Acacio was inside the house.  Shortly after midnight, the CW received a phone call from Acacio, and they exchanged New Year's greetings before she hung up.  Soon after the phone call, the CW saw Acacio exit the house and she entered the house, went to her bedroom, and started preparing for bed.  As she was doing this, Acacio came into the bedroom, closed the door, and said that he wanted to fix their relationship.  The CW responded that their relationship was over; at this point, Acacio became mad and emotional and said that he would kill himself.  The CW responded, "go ahead, it's not my fault," and Acacio left the bedroom and returned holding a kitchen knife.  Acacio pointed the knife at himself and kept repeating that he was going to kill himself.  Acacio then "changed his mind," pointed the knife at the CW, and started saying, "I will kill you."  The CW knocked the knife out of Acacio's hand, and Acacio then grabbed her by the face and punched her in the stomach.  When Acacio turned around to grab the knife, the CW locked herself in the bathroom and called 911.

On cross-examination, the deputy public defender (DPD) elicited the following testimony from the CW:

> [DPD:] When you called 911, you told Rainier you were calling 911; right?

4

[CW:] Yes.
[DPD:] You told him to grab your things?
[CW:] And leave the house.
[DPD:] And leave, right, leave me alone?
[CW:] Yes.
[DPD:] Leave my family alone?
[CW:] Yes.
[DPD:] But he didn't leave; right?
[CW:] Yes, ma'am.
[DPD:] And when he didn't leave, you got upset?
[CW:] Excuse me?
[DPD:] When he didn't listen to you when you told him to leave, when he stayed there, you got upset?
[CW:] Yes, ma'am.
[DPD:] Because you had already been broken up with him for two weeks; right?
[CW:] Yes, ma'am.
[DPD:] He was still living in the house?
[CW:] Yes, ma'am.
[DPD:] You wanted him out of the house?
[CW:] Yes, ma'am.
[DPD:] He was supposed to be looking for a place; right?
[CW:] Yes, ma'am.
[DPD:] You didn't think he was actually looking for a place?
[CW:] He told me that he's looking for a place and he asking for a time to look for a place.
[DPD:] But you didn't believe he was doing that; right?
[CW:] No, I don't believe.
[DPD:] So that made you upset, too; right?
[CW:] Yes.

. . . .

[DPD:] But you were upset he's still there?
[CW:] Yes.
[DPD:] And that he won't go away?
[CW:] Yes.
[DPD:] He won't get out of the house?
[CW:] Yes.
[DPD:] And you know that Rainier is not a citizen of the United States; right?
[CW:] Yes.
[DPD:] You know that if he gets arrested he can get sent back to the Philippines; right?
[CW:] Yes.
[Deputy Prosecuting Attorney:] Objection.
THE COURT: Objection is sustained. The jury is advised that immigration status has nothing to do with these charges. The jury is to determine the guilt or innocence as to Counts 1 and 2 and I'm instructing you to disregard any mention or any comments concerning the defendant's immigration status.

. . . .

[DPD:] But you wanted him out of the house?
[CW:] Yes, ma'am.

5

> [DPD:] Out of your life?
> [CW:] Yes, ma'am.
> [DPD] And you knew if he got arrested he would leave?
> [CW:] Yes, ma'am.

(Emphases added.)

After the jury was excused for the day, the DPD explained why she questioned the CW about her knowledge of Acacio's immigration status:

> [DPD:] Thank you, Your Honor.  With respect to the State's objection to my questioning regarding my client's --
> THE COURT: Immigration status.
> [DPD:] -- status, yes, Your Honor, it's the defense's position that that goes to bias, interest, motive, specifically the motive to fabricate.  I don't think that -- I mean, I think it's clear from my voir dire that part of our defense is that she fabricated at least certain portions of this.  Why she fabricated or the motive involved would be highly relevant.
>     That was the only reason why that question was posed to the witness, simply to establish she was aware of that and that she knew there would be consequences which would have substantiated a motive, and that was why I asked the question.  In fact, the question that I was objected to, which was two questions to it, that was the only question I was going to ask and nothing further.
> THE COURT: I understand, and I'm not saying it was done in bad faith, I understand your reasons and rationale for doing that.  However, on the other side of the coin, penalty and punishment shall not be considered by the jury and deportation of a person is a form of punishment.  And I -- and under the facts and circumstances of this case, I feel that even notwithstanding your good faith in breaching the topic, that the prejudicial effect substantially far outweighs the probative value and so I sustained the objection.  But, again, I find that you had a good faith basis for the question.

On the next court date, and before the jury was brought in, the DPD once again clarified her stance on the immigration issue:

> [DPD:] Yes, Your Honor.  With respect to the objection that I made at the end of our last -- before our last recess, which was specifically my questions regarding my client's immigration status, I just also wanted to clarify for the

record that I had asked -- I'm sorry -- asked the complaining witness if she was aware of my client's status. She had indicated yes. I then asked if she was aware of the consequences of him being arrested, where there was the objection and it was sustained.

But I wanted to place on the record that I have a good-faith basis to believe that she would be able to respond in the affirmative due to the fact she is not a citizen as well. So she would be aware of the consequences of someone being arrested and not being a citizen.

Additionally, although I did not request it before, I think given the fact that she may be recalled, I'd ask the Court to consider allowing the question but doing a limiting instruction to the jury which would address the prejudice that the Court referenced, which is that it goes more to penalty or punishment as opposed to motive and credibility. I believe that if the jury was instructed that they could only consider it for the limited purpose of determining the complaining witness' credibility and her motive, that could address any of the prejudice issues.

THE COURT: I understand the defendant's concern. The Court has done a balancing act, and this Court finds that even though it may be relevant as far as 609 or bias or motive for interest, or whatever theory you may wish to blame this on, this Court still believes that the prejudicial offense still outweighs the probative value of that question, particularly in light of the fact that penalty or punishment would be now front and center for our jury's consideration. And I don't think that would be proper, but your point is well taken.

[DPD:] And the Court does not believe that that could be cured through a limiting instruction?

THE COURT: No, I don't think that a limiting instruction would fix that, especially in light of the fact that you would not -- you would also be seeking to get that same information out about the complaining witness herself, which is, I feel, even further outside the potential circle.

[DPD:] Actually, Your Honor, to clarify, I didn't intend on asking the complaining witness that question about her status. But my good-faith basis belief that she knew about the consequences was based on the information that I received that she is not a citizen, but I was not going to ask her about that.

THE COURT: Well, the Court would appreciate that. But the Court still feels that this -- the balancing of the interest falls in favor of exclusion of that question.

[DPD:] Okay.

Acacio testified that he and the CW had not been together as a couple for about two weeks before the New Year's celebration and that, after midnight on January 1, 2012, he did

7

approach the CW in the bedroom to talk to her about their relationship.  Acacio testified that the CW appeared angry and told him, "[w]e don't need to talk anything out.  We're done."  Acacio explained that he felt hurt and that he retrieved a knife from the kitchen and returned to the bedroom "to show her that I will kill myself."  Acacio testified that he never pointed the knife at the CW.

On November 21, 2012, the jury found Acacio guilty of terroristic threatening in the first degree and not guilty of abuse of family or household members.  On February 4, 2013, the circuit court entered a judgment of conviction and probation sentence, which sentenced Acacio to five years of probation.

## B.    ICA Proceedings

On appeal,[2] Acacio argued that the circuit court erred in precluding Acacio from cross-examining the CW on whether she was aware of his immigration status.  According to Acacio, his immigration status was relevant because it established the CW's "bias, interest and motive to fabricate her story."  As a result, Acacio claimed that the circuit court violated his "constitutional right to confront witnesses via cross-

---

[2]    Acacio raised two issues on appeal before the ICA, the second relating to an undisputed Hawaiʻi Rules of Penal Procedure Rule 16 violation.  Because our resolution of the first issue is dispositive of the second, we do not address it.

examination."

In response, the State argued that the jury had "ample information" as to the CW's motive without receiving evidence of Acacio's immigration status. As such, the State claimed that because "the constitutionally required threshold level of inquiry" was afforded Acacio, the circuit court did not err in examining the evidence under Hawaiʻi Rules of Evidence (HRE) Rule 403 and concluding that it was more prejudicial than probative. The State asserted that evidence of the CW's knowledge of Acacio's immigration status was more prejudicial than probative because questions regarding a defendant's immigration status appeal to the trier of fact's passion and prejudice.

On July 29, 2016, the ICA entered a summary disposition order (SDO), which affirmed the circuit court's judgment of conviction and sentence. State v. Acacio, No. CAAP-13-0000132, 2016 WL 4078838, at *1 (Haw. Ct. App. July 29, 2016). As to the issue of Acacio's immigration status, the ICA concluded that "Acacio was afforded a level of inquiry on cross-examination sufficient to satisfy the confrontation clause of the Sixth Amendment to the U.S. Constitution." Id. at *1. In reaching this conclusion, the ICA explained that the circuit court "does not abuse its discretion in excluding evidence tending to impeach a witness 'as long as the jury has in its possession sufficient

9

information to appraise the biases and motivations of the witness.'" Id. (quoting United States v. Easter, 66 F.3d 1018, 1022-23 (9th Cir. 1995)). The ICA then provided the following analysis:

> In the instant case, although the Circuit Court did not allow Acacio to cross-examine the CW specifically regarding her knowledge of his immigration status, the Circuit Court did allow Acacio to cross-examine the CW concerning her general understanding that if Acacio got arrested, he would leave their shared residence. That is, the Circuit Court permitted Acacio to establish through the CW's testimony that she wanted Acacio out of the house; that, if he was arrested, he would leave; that she was angry that Acacio remained in the house after she asked him to leave; and that she had been angry shortly before she spoke to police officers. Each of these topics relates to the CW's alleged bias or motive to lie. Thus, the Circuit Court complied with the Sixth Amendment and provided Acacio with ample opportunity to cross-examine the CW to demonstrate her bias or motive to lie. *See Levell*, 128 Hawaiʻi at 40, 282 P.3d at 582 (citing *Balisbasana* [sic], 83 at 114, 924 P.2d at 1220).
>
> Because Acacio was afforded the threshold level of inquiry under the confrontation clause, the Circuit Court was then permitted to exercise its discretion under HRE Rule 403 and balance the prejudicial effect against the probative value of exposing the jury to evidence that Acacio's arrest could result in his deportation because he was not a citizen. We conclude that the Circuit Court did not abuse its discretion in excluding the proffered evidence. The probative value of the proffered evidence to show the CW's motive and bias to testify falsely was attenuated and weak. The CW's knowledge of the potential deportation consequences of her testifying falsely did not show or provide a persuasive explanation for why she would testify falsely. In any event, the proffered evidence was cumulative of evidence permitted by the Circuit Court – that the CW knew that Acacio's arrest would require him to leave her house. On the other hand, as the Circuit Court noted, questions concerning the penalty or punishment a defendant may face are not proper subjects for the jury to consider. In addition, a jury's verdict cannot be based on sympathy for the defendant. The proffered evidence created a substantial risk that the jury would be unduly influenced or distracted by concerns that a finding of guilt would lead to Acacio's deportation – an improper subject for the jury to consider. As such, the Circuit Court did not abuse its discretion in concluding that the prejudicial effect of the excluded evidence substantially outweighed its probative value. Therefore, the first point of error fails.

10

Id. at \*2.

On September 9, 2016, the ICA entered a judgment on appeal affirming the circuit court's February 4, 2013 judgment of conviction and probation sentence.

## III. STANDARDS OF REVIEW

### A. Admissibility of Evidence

> As a general rule, [the appellate] court reviews evidentiary rulings for abuse of discretion. Kealoha v. County of Hawaiʻi, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993). However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under Hawaiʻi Rules of Evidence (HRE) Rules 401 and 402, [the appellate] court applies the right/wrong standard of review. Id. at 319, 844 P.2d at 676; State v. White, 92 Hawaiʻi 192, 204-05, 990 P.2d 90, 102-03 (1999).

Moyle v. Y&Y Hyup Shin, Corp., 118 Hawaiʻi 385, 391, 191 P.3d 1062, 1068 (2008) (brackets omitted) (citing Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 104, 176 P.3d 91, 103 (2008)).

"The trial court's determination that the proffered evidence is probative of bias, interest or motive is reviewed under the right/wrong standard." State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996) (citing State v. Kupihea, 80 Hawaiʻi 307, 314, 909 P.2d 1122, 1129 (1996)).

### B. Confronting Adverse Witnesses

> Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard. In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine whether there is a reasonable

11

>          possibility that the error complained of might have
>          contributed to the conviction.

State v. Pond, 118 Hawaiʻi 452, 461, 193 P.3d 368, 377 (2008)

(citing Balisbisana, 83 Hawaiʻi at 113-14, 924 P.2d at 1219-20).

### IV.  DISCUSSION

Although Acacio raises three issues in his application

for writ of certiorari, we do not address all three as we find

his first issue dispositive:  whether the circuit court erred in

precluding Acacio from cross-examining the CW as to her knowledge

of his immigration status.  We agree with Acacio's argument as to

this issue and hold that the ICA erred when it held that the

circuit court did not err in preventing Acacio from pursuing this

line of questioning.

**A.    The ICA erred in affirming the circuit court's decision to prohibit the defense from questioning the CW as to her knowledge of Acacio's immigration status.**

"An accused's right to demonstrate the bias or motive

of prosecution witnesses is protected by the sixth amendment to

the United States Constitution, which guarantees an accused,

*inter alia*, the right 'to be confronted with the witnesses

against him [or her].'"  Balisbisana, 83 Hawaiʻi at 115, 924 P.2d

at 1221.  "Indeed, the main and essential purpose of

confrontation is *to secure for the opponent the opportunity of*

*cross-examination*[,] . . . [and] the exposure of a witness'

motivation in testifying is a proper and important function of

12

the constitutionally protected right of cross examination." Id. (alteration in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). Additionally, HRE Rule 609.1(a) (1993) provides that the "credibility of a witness may be attacked by evidence of bias, interest, or motive." This court has established that "bias, interest, or motive is *always relevant* under HRE Rule 609.1." State v. Levell, 128 Hawaiʻi 34, 40, 282 P.3d 576, 582 (2012) (brackets omitted) (quoting State v. Estrada, 69 Haw. 204, 220, 738 P.2d 812, 823 (1987)).

When determining whether a defendant has been afforded his constitutional right to demonstrate bias or motive on the part of the complaining witness, the appropriate inquiry "is whether the jury had sufficient information from which to make an informed appraisal of [the complaining witness's] motives and bias[.]" Balisbisana, 83 Hawaiʻi at 116, 924 P.2d at 1222; see also Levell, 128 Hawaiʻi at 40, 282 P.3d at 582 ("[T]he appropriate inquiry is whether the trier of fact had sufficient information from which to make an informed appraisal of the witness's motives and bias.").

Once this step has been satisfied, the court may then consider whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. See Levell, 128 Hawaiʻi at 40, 282 P.3d at 582 ("[E]vidence of

13

witness bias is relevant, and . . . the trial court's discretion to exclude evidence under HRE Rule 403 only becomes operative after the threshold level of inquiry under the confrontation clause has been afforded."). As such, the second step is not triggered until the defendant is afforded the threshold level of inquiry under the confrontation clause; once this occurs, the trial court may conduct a balancing test to weigh the probative value of any additional motive evidence against its potential for undue prejudice. Id. at 39, 282 P.3d at 681 ("[T]he trial court's discretion becomes operative 'only *after the constitutionally required threshold level of inquiry has been afforded the defendant*.'" (quoting Balisbisana, 83 Hawaiʻi at 114, 924 P.2d at 1220)).

In the present case, the ICA concluded under the first step that Acacio's right to confrontation was not violated because the jury had sufficient information to make an informed appraisal of the CW's motive. Acacio, 2016 WL 4078838, at *2. The ICA explained that, although the circuit court did not allow Acacio to cross-examine the CW about her knowledge of Acacio's immigration status, the circuit court did allow cross-examination as to the CW's "general understanding that if Acacio got arrested, he would leave their shared residence." Id. Then, under the second step, the ICA conducted a balancing test and

14

concluded that the "probative value of the proffered evidence to show the CW's motive and bias to testify falsely was attenuated and weak," while the potential for prejudice was much stronger. Id.

For the following reasons, we conclude that the ICA erred under both steps of its analysis.

### 1. Acacio was not afforded the threshold level of inquiry under the confrontation clause because the jury did not have sufficient information to evaluate the CW's motive.

The ICA erred under the first step of this test when it concluded that the circuit court provided Acacio "ample opportunity [under the Sixth Amendment] to cross-examine the CW to demonstrate her bias or motive to lie." Acacio, at *2. This court has considered variations of this issue in several cases and has clearly stated that the trier of fact must have sufficient information from which to make an informed appraisal of the complaining witness's motives and bias.

For example, in Balisbisana, the defendant was charged with abuse of a family or household member. 83 Hawaiʻi at 111, 924 P.2d at 1217. At trial, the family court excluded reference to the complaining witness's conviction for harassing the defendant, and the defendant was subsequently convicted. Id. at 113, 924 P.2d at 1219. The defendant appealed and argued that

15

the circuit court's exclusion of the complaining witness's conviction violated his right to confront the witness and expose evidence of her motive for bringing false charges against him. Id. at 113-14, 924 P.2d at 1219-20.  This court agreed with the defendant, and vacated his conviction.  Id. at 116-17, 924 P.2d at 1222-23.

In coming to this conclusion, this court explained that "[t]he appropriate inquiry, therefore, is whether the jury had sufficient information from which to make an informed appraisal of [the complaining witness's] motives and bias, absent evidence of her conviction for harassing [the defendant]."  Id. at 116, 924 P.2d at 1222.  This court noted that the "trial court prohibited *all* inquiry into [the complaining witness's] conviction for harassing [the defendant]" and that a "reasonable jury might have received a significantly different impression of [the complaining witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination."  Id.  As such, this court held that the "trial court abused its discretion in excluding evidence of [the complaining witness's] conviction from which the jury could have inferred that [the complaining witness] had a motive to bring false charges against [the defendant] and give false testimony at trial."  Id.

16

Likewise, in State v. Marcos, 106 Hawaiʻi 116, 102 P.3d 360 (2004), the defendant, who was charged with and convicted of abuse of a family or household member, was not allowed to cross-examine the complaining witness about the pending family court case concerning the custody of their child. On appeal, the defendant argued that the complaining witness had a motive to fabricate her allegations against him, and that his right to cross-examine the complaining witness to demonstrate her motive was violated. Id. at 117, 102 P.3d at 361.

This court agreed with the defendant and concluded that he "had the right on cross examination to establish bias or prejudice." Id. at 122, 102 P.3d at 366. Citing to Balisbisana, this court reiterated that "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the complaining witness's] testimony which provided a crucial link in the proof." Id. As such, this court held that the defendant's right of confrontation, as guaranteed by the United States and Hawaiʻi Constitutions, was violated. Id.

More recently, in Levell, the defendant was charged with harassment for allegedly shoving the complaining witness. 128 Hawaiʻi at 35, 282 P.3d at 577. Prior to the commencement of trial, the circuit court denied the defendant's motion to cross-

17

examine the complaining witness on whether she had stolen and used the defendant's credit cards after he was arrested. Id. at 35-36, 282 P.3d at 577-78. The circuit court decided that evidence of the stolen credit cards was not relevant and was outweighed by the danger of unfair prejudice to the complaining witness. Id. at 36, 282 P.3d at 578. This court vacated and remanded this decision and held that the defendant's right to confrontation was violated:

> Respondent's case against Petitioner hinged on the court's willingness to believe Complainant's testimony over Petitioner's version of the events, and Petitioner's accusation against Complainant may have given her a motive to slant the nature of her testimony against Petitioner. Had Petitioner been allowed to ask, he might have succeeded in eliciting testimony from Complainant tending to show that she was biased or had a motive to fabricate or exaggerate a story about harassment and to testify falsely in court. This, in turn, could have affected the court's view of Complainant's credibility, and might have led the court to conclude that Respondent had not proven its case. Without evidence of Complainant's potential bias or motive, the court did not have a sufficient basis from which to make an informed appraisal of Complainant's credibility. See Balisbisana, 83 Hawaiʻi at 116, 924 P.2d at 1222. As such, Petitioner's right to confrontation was violated when the court prevented him from cross-examining Complainant about the alleged credit card theft.

Id. at 40, 282 P.3d at 582.

As these cases illustrate, in order to satisfy the confrontation clause, a defendant must be given the opportunity to cross-examine a witness as to his or her bias or motive. Applying this rule to the present case, the circuit court clearly curtailed Acacio's effort to extract specific information from the CW relating to her motive when it prohibited cross-

18

examination of the CW as to her knowledge of Acacio's immigration status. This information, specifically the CW's awareness of Acacio's risk of deportation if he were arrested, raises the question of whether the CW accused Acacio of these offenses in order to have Acacio deported and permanently removed from her life. This information was especially important for the jury to consider in light of the CW's earlier testimony that she wanted Acacio out of the house but that he still had not left two weeks after their break-up. The possibility of Acacio's deportation presented a lasting solution to the CW's relationship issues with Acacio, and may have motivated the CW to exaggerate or fabricate her story. As such, without evidence of the CW's knowledge of Acacio's risk of deportation if arrested, the jury did not have sufficient information from which to make an informed appraisal of the CW's motive.

The ICA determined that the jury did have sufficient information from which to make an informed appraisal of the CW's motive because the circuit court allowed Acacio to establish through the CW's testimony that: 1) she wanted Acacio out of the house, 2) she was angry that Acacio remained in the house after she asked him to leave, and 3) she was angry with Acacio right before she spoke to police officers. Acacio, 2016 WL 4078838, at *2. We disagree. In Levell, this court did not accept a similar

19

argument when it determined that giving a defendant "considerable latitude" during cross-examination of the complaining witness is not sufficient if the defendant is deprived of an opportunity to present evidence about the source of the complaining witness's potential bias or motive.  128 Hawaiʻi at 41, 282 P.3d at 583. The Levell court concluded that the circuit court erred in precluding cross-examination of the complaining witness as to the credit card issue because "the court did not have in its possession sufficient information to apprise itself of the alleged bias and motivation of Complainant on what Petitioner indicated was the source of such a bias or motivation -- the alleged credit card theft."  Id.

Similarly, the jury in this case did not have sufficient information to apprise itself of the source of the CW's alleged motivation for calling the police and testifying against Acacio, namely that the CW was trying to permanently remove Acacio from her house and her life by removing him from the country.  As such, the circuit court did not afford Acacio with the threshold level of inquiry required under the confrontation clause; the ICA erred in concluding otherwise under the first step of its analysis.

### 2. The CW's motive evidence was improperly excluded pursuant to HRE Rule 403.[3]

Even if the ICA were correct that the threshold level of inquiry was met under the confrontation clause, the ICA erred in the second step of its analysis when it concluded that the evidence of the CW's knowledge of Acacio's immigration status was properly excluded under HRE Rule 403.

HRE Rule 403 (1993) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The circuit court was concerned that evidence of Acacio's immigration status was unduly prejudicial because "penalty and punishment shall not be considered by the jury and deportation of a person is a form of punishment." Similarly, the ICA noted that "a jury's verdict cannot be based on sympathy for the defendant" and that the evidence of Acacio's immigration

---

[3] We note that this step in our analysis is not necessary because we conclude that the threshold level of inquiry under the confrontation clause was not met. See Levell, 128 Hawaiʻi at 40, 282 P.3d at 582 ("[T]he trial court's discretion to exclude evidence under HRE Rule 403 only becomes operative after the threshold level of inquiry under the confrontation clause has been afforded."). We address the ICA's analysis under the second step, however, for the sake of thoroughness and to provide guidance in this area of the law.

status "created a substantial risk that the jury would be unduly influenced or distracted by concerns that a finding of guilt would lead to Acacio's deportation -- an improper subject for the jury to consider." Acacio, 2016 WL 4078838, at *2.

It is true that questions about a defendant's immigration status are generally considered both irrelevant and prejudicial in criminal proceedings. See State v. Avendano-Lopez, 904 P.2d 324, 331 (Wash. Ct. App. 1995) ("Questions regarding a defendant's immigration status are similarly irrelevant and designed to appeal to the trier of fact's passion and prejudice and thus are generally improper areas of inquiry."); Salas v. Hi-Tech Erectors, 230 P.3d 583, 586 (Wash. 2010) ("Issues involving immigration can inspire passionate responses that carry a significant danger of interfering with the fact finder's duty to engage in reasoned deliberation."); Gonzalez v. City of Franklin, 403 N.W.2d 747, 760 (Wis. 1987) (noting that evidence of the possibility of the defendant's deportation if found guilty would have an "obvious prejudicial effect" for the defendant).

However, in this case, questions about Acacio's immigration status were not used for an improper purpose. See Avendano-Lopez, 904 P.2d at 331 ("It is well-established that appeals to nationality or other prejudices are highly improper in

22

a court of justice, and evidence as to the race, color, or nationality of a person whose act is in question is generally irrelevant and inadmissible <u>if introduced for such a purpose</u>." (emphasis added)).  In this case, the DPD made it clear that she was introducing this evidence in order to show the CW's motive, and the circuit court acknowledged that the line of questioning was not done in bad faith.

Additionally, the circuit court's concern about unfair prejudice could have been allayed by a limiting instruction, which would have directed the jury to consider Acacio's immigration status only for the purpose of evaluating the motive of the CW, and not for purposes of penalty, punishment, or other collateral consequences.  Thus, because Acacio's immigration status was highly probative evidence of the CW's motive, and because its prejudicial effect could have been contained through a limiting instruction, the ICA erred in concluding that the circuit court did not abuse its discretion when it excluded the evidence from trial.

In sum, we conclude that the ICA erred in both steps of its analysis on this point of appeal.  Accordingly, Acacio's right to confrontation was violated when the circuit court prevented him from cross-examining the CW about her knowledge of his immigration status.  We turn now to examining whether this

error was harmless.

## B.   The error was not harmless beyond a reasonable doubt.

"Denial of a defendant's constitutionally protected opportunity to impeach a witness for bias, motive or interest is subject to harmless error analysis." Balisbisana, 83 Hawaiʻi at 117, 924 P.2d at 1223 (citing State v. Corella, 79 Hawaiʻi 255, 261, 900 P.2d 1322, 1328 (App. 1995)).  "In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Pond, 118 Hawaiʻi at 461, 193 P.3d at 377 (citing Balisbisana, 83 Hawaiʻi at 113-14, 924 P.2d at 1219-20). This court considers a number of factors in determining whether an error is harmless in this context, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Levell, 128 Hawaiʻi at 42, 282 P.3d at 584 (quoting Olden v. Kentucky, 488 U.S. 227, 233 (1988)); see also Balisbisana, 83 Hawaiʻi at 117, 924 P.2d at 1223.

Here, there is a reasonable possibility that the

24

circuit court's error might have contributed to Acacio's conviction. The CW's testimony was crucial to the prosecution's case because she was the only eyewitness to Acacio's alleged threat and abuse against her. Because the alleged threats and abuse occurred in the CW's bedroom, with only Acacio and the CW present, the case turned on the credibility of these two parties. As such, evidence of the CW's motive to exaggerate or fabricate her story would have been helpful for the jurors in assessing the CW's credibility and in ultimately determining which party to believe.

And while the circuit court allowed cross-examination as to the CW's potential ulterior motives for fabricating an allegation of abuse, the court did not permit any cross-examination with respect to the CW's potential motive to get Acacio deported. The possibility of Acacio's deportation, which would appear to permanently solve the CW's issues with her ex-boyfriend, could have furnished a strong motive for the CW to testify falsely. As such, we conclude that there is a reasonable possibility that the circuit court's error in limiting the CW's testimony on the subject of Acacio's immigration status might have contributed to Acacio's conviction and was thus not harmless beyond a reasonable doubt.

## V.   CONCLUSION

For the foregoing reasons, we vacate the ICA's September 9, 2016 judgment on appeal, vacate the circuit court's February 4, 2013 judgment of conviction and probation sentence, and remand this case to the circuit court for a new trial.

Jon N. Ikenaga
and Titiimaea N. Taʻase
for petitioner

Brian R. Vincent
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



26