**Electronically Filed
Supreme Court
SCWC-17-0000660
04-JUN-2020
07:53 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

ALEXANDER MIRANDA,
Petitioner/Defendant-Appellant.

SCWC-17-0000660

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000660; CR. NO. 16-1-0315)

JUNE 4, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

A defendant in a criminal prosecution has a

constitutionally protected right to cross-examine a witness for

potential bias or motive.  In this case, the defendant argues

that this right was violated when the circuit court prevented

defense counsel from cross-examining the complainant about

disciplinary action the complainant might have faced as a United States Marine for instigating a fight in violation of its code of conduct provisions. We conclude that because the defense was precluded from questioning the complainant about this potential source of bias, the jury did not have sufficient information from which to make an informed appraisal of the complainant's motives or bias. We also provide guidance concerning the admissibility of other evidence as to the contents of a destroyed video recording under Hawai'i Rules of Evidence Rules 1004 and 403.

## I.    BACKGROUND AND PROCEDURAL HISTORY

On March 27, 2015, Alexander Miranda was involved in an altercation in which complainant David Metts' jaw and nose were broken. Miranda was subsequently charged by felony information, on March 2, 2016, in the Circuit Court of the First Circuit (circuit court) with committing the offense of assault in the Second Degree, in violation of Hawai'i Revised Statutes (HRS) § 707-711(1)(a) or (b).[1] Miranda pleaded not guilty to the charge.

---

[1]     HRS § 707-711(1) (2014) provides in relevant part as follows:

(1) A person commits the offense of assault in the second degree if:

(a) The person intentionally or knowingly causes substantial bodily injury to another;

(continued . . .)

**A. Pre-Trial Proceedings**

Prior to trial, Miranda filed a motion to dismiss the charge, arguing that the State's delay in bringing the charge violated his due process right to a fair trial. In a declaration submitted with the motion, defense counsel averred the following facts. The altercation occurred on the sidewalk in front of an ABC store in Waikīkī around midnight on March 27, 2015. Shortly after, in the early morning of March 28, Miranda and his friend Steven Rodriguez were arrested for their involvement in the incident. After their arrest, Officer Arthur Gazelle of the Honolulu Police Department (HPD) reviewed security camera footage from the ABC store, which recorded the altercation. Officer Gazelle took a photograph of the video screen when it showed Rodriguez and Metts, but not Miranda. HPD Detective (Det.) Michael Burger was thereafter assigned to investigate the incident. According to Det. Burger's closing report, he contacted Newell Hirata, an ABC employee, sometime during his investigation and Hirata informed him that the surveillance video was no longer available.[2] Miranda maintained

---

(. . . continued)

        (b) The person recklessly causes serious or substantial bodily injury to another[.]

    [2]    At the hearing on the motion, Miranda's counsel argued that he had contacted Hirata, who would testify that he never received a request for the video. However, counsel declined the circuit court's offer to continue the hearing in order to subpoena Hirata.

that the loss of the video was caused by the State's delay in bringing the charge, and because the video would have shown that Metts was the first aggressor and Miranda acted in self-defense, the loss of the video violated his right to a fair trial.

At the hearing on the motion to dismiss,[3] Officer Gazelle testified that the relevant portion of the video lasted about four minutes and showed an argument between Metts, his companion Casey Smith, Miranda, Rodriguez, and multiple other individuals. According to Officer Gazelle, Metts and Smith did not strike Miranda or Rodriguez, and it did not appear that they were instigating the fight. Miranda threw the first punch, striking Metts in the face, and after moving 10 to 15 feet away from the group, he suddenly ran back to punch Metts again. Officer Gazelle also stated that he took a photograph of the video and that it showed Metts and Rodriguez. The court denied the motion, concluding that Miranda had not proven that he suffered actual prejudice from the video's destruction because the testimony indicated that the video was not exculpatory and would not have supported his claim of self-defense.

---

[3] The Honorable Dexter D. Del Rosario presided over the hearing.

## B. Trial and Post-Trial Proceedings

A jury trial commenced with motions in limine on April 10, 2017.[4] The State sought permission to present Officer Gazelle's testimony regarding the contents of the video. Miranda filed a written opposition and a separate motion in limine seeking an order precluding Officer Gazelle's testimony as to the video's contents. The court ruled that Officer Gazelle could testify that he viewed the video, but he would be precluded from describing its contents.

Defense counsel then informed the court that the defense would seek to admit the photograph that Officer Gazelle had taken of the security video screen into evidence. Counsel asked the court to make a ruling as to the admissibility of the photograph, which according to the officer's report showed the moment before Rodriguez punched Metts' face. Miranda was not in the picture, counsel explained, and it was consistent with Miranda's defense that he had walked away after throwing one punch in self-defense to stop the fight. The court stated that it was unable to determine the relevance of the photograph without knowing what the testimony of the witnesses would be. Defense counsel proposed to give an offer of proof, but the court stated that the issue could be decided at the bench or

---

[4]     The Honorable Sherri L. Iha presided over the trial proceedings.

during recess after the relevant witnesses had testified. The State maintained that allowing the photograph into evidence would open the door to Officer Gazelle's testimony as to the video's contents. The court noted that it was "one picture in an entire video" and that its introduction might open the door to testimony regarding the contents of the video recording.

The State called Samuel Wight as its first witness. Wight testified that on the night of the incident, he was walking in Waikīkī when he heard shouting and cursing. He turned around and saw three people confronting two other people; the trio was yelling at the other two individuals, who were not yelling back. According to Wight, the taller male of the three individuals, who he later identified as Miranda, was standing about a meter away from Metts, who had his hands up with his palms facing forward. Miranda took a step toward Metts and punched him with an uppercut. Wight said that he heard a loud cracking sound and saw Metts start spitting blood. Wight ran over to the group and Miranda was cocking his fist back as if he was going for another hit, but he did not punch Metts again. Wight acknowledged that he did not include in his written statement to police that he witnessed a "fist cocked back" or heard a loud cracking sound. Wight also stated that he did not see anyone else punch Metts and did not see Metts push or punch anyone in the other group or get into a fighting stance.

Metts, who was enlisted in the United States Marines at the time of the incident, testified that on the evening of March 27, 2015, he was at a bar in the Waikīkī area just before midnight with Smith, also a marine.  He stated that he had no more than three drinks at the bar and was not drunk.  Metts said that he and Smith encountered Miranda and two other men on the sidewalk in Waikīkī.  As they passed the group, he turned his body to let them by and was shoulder-bumped.  When he turned around to see what had happened, the three males were looking back at them.  One of the three males stood "forehead to forehead" with Smith, whose shoulder was in a sling.  Metts said that he shifted his focus to Smith when he saw the sling get ripped off Smith's shoulder and that he was then struck across the face.  He immediately felt blood fill his mouth and his mouth felt different.  He believed he was struck again, but he was no longer positive and only remembered being hit once.  Metts testified that he never touched Miranda or any of his friends.

On cross-examination, Metts acknowledged that he said he had shoved someone during an interview with a detective, but that now he did not remember shoving anyone or saying that he did.  He also acknowledged telling the detective in the interview that he had been punched twice.  Metts stated that during a field lineup, he singled out Miranda as the person who

punched him and stated that both Miranda and the person next to him in the lineup were part of the group. Audio from the recorded interview was played for the jury. In the recording, Metts stated that he was hit twice by the same person while trying to keep one of the males away from his friend, and that during the identification procedure he pointed out two of the males in the lineup but could not say which one hit him.[5]

Defense counsel then asked Metts about the "Marine Corps . . . code of conduct," (code of conduct) but the State objected to the question as irrelevant. The following exchange took place:

> [DEFENSE COUNSEL]: What's the policy--what's the code of conduct on alcohol?
>
> [METTS]: I don't know it verbatim.
>
> [DEFENSE COUNSEL]: Just tell me what your recollection is of it.
>
> [METTS]: Don't get overly drunk and make a fool of yourself.
>
> [DEFENSE COUNSEL]: Okay. What are the consequences if you violate that code of conduct?
>
> [PROSECUTOR]: Objection. Relevance.
>
> THE COURT: Sustained.

Defense counsel asked for a bench conference and argued that the questions went to bias and motive. The court replied there was no evidence that Metts was overly drunk or acting out and it

---

[5] Metts acknowledged the inconsistency in his testimony. On re-direct examination, Metts testified he was on painkillers at the time he gave his interview, his voice in the audio was "slower and slurrier," his "thinking" at the time was slower, and it was harder to focus.

would not "allow [defense counsel] to place that on trial here."
The State argued that, because Metts was no longer in the
Marines, "bias, interest, and motive is gone." Defense counsel
responded, "This is at the time of the offense--" to which the
court replied, while counsel was in mid-sentence, "Right. I
understand," and ended the bench conference.

Defense counsel then attempted to ask Metts about the
code of conduct with regard to fighting, and the State's
objection was sustained before Metts could respond:

> [DEFENSE COUNSEL]: What is the Marine code of conduct in
> terms of fighting?
>
> [PROSECUTOR]: Objection, Your Honor.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Okay. Okay.

Dr. Jerry Beckham, who attended to Metts' injuries
after the incident, testified that Metts stated he had been hit
twice in the face and complained of jaw and nose pain. Metts
had a jaw fracture in two places and a nose fracture, and his
injuries were consistent with blunt force trauma to the face.
The doctor stated that he could not say how many times Metts had
been hit and that his injuries could be consistent with being
punched once or more than once.

HPD Officer Riley Saunders, who arrived at the scene
after the incident occurred, testified that he apprehended
Miranda, Rodriguez, and Victor Vargas as they were running away

from the scene. He placed the three men in a field lineup with a male bystander who had not been involved in the incident. Wight and Metts both identified Miranda and Rodriguez as males that had hit Metts. Officer Saunders stated that, at some point after the identification, Miranda said, "Officer, to be honest, I did it. I hit the kid." The officer further testified that during booking he noticed Rodriguez wince as his handcuffs were removed and that his right hand "look[ed] a little puffy"; the officer did not recall observing any injuries to Miranda's hands.

Officer Gazelle testified that on the night of the incident he was flagged down in response to an assault-type case that occurred in front of an ABC store. The officer stated that he viewed a surveillance video from the ABC store but was unable to obtain a copy of it at the time. He left a form with the manager requesting a copy of the video. Officer Gazelle indicated that he took one picture of the surveillance video with his phone.

Det. Burger testified that he interviewed Metts in the early morning of March 28, 2015, in an emergency room at Tripler Medical Army Hospital. He prepared two separate photographic lineups, one containing a photograph of Miranda and the other containing a photograph of Rodriguez, prior to meeting with Metts and Smith at the hospital. Neither Metts nor Smith was

able to identify anyone depicted in the photographs as being a suspect in the case. Det. Burger testified that he learned during his investigation that Rodriguez may have assaulted Metts. The detective also explained that he obtained an administrative subpoena requesting the video surveillance from the ABC store and was eventually told the video had been written over.

Miranda testified that he, Rodriguez, and Vargas were enlisted in the United States Army and stationed on Oʻahu at the time of the incident. That evening, as they were walking toward an ABC store in Waikīkī, one of his friends was teasing him about an ex-girlfriend and pointing in the direction she used to live; they began laughing and continued walking. Miranda heard someone say, "What the fuck? What the fuck did you just say to me? I'll fuck you up?" and he, Rodriguez, and Vargas turned around. Metts and Smith were yelling at them, and Rodriguez headed toward the two men as they headed toward them, until Rodriguez and Metts were face to face. Metts shoved and grabbed Rodriguez, Miranda stated. He told Metts and Smith to relax and that they were not talking about them. Metts replied that he "[didn't] give a fuck, he'll fuck me up," and came towards him; Miranda stated that he then defended himself with one punch to the right side of Metts' face, aiming for the nose. He started to walk away and turned around again when he noticed that

neither of his two friends had followed him, and he saw Rodriguez in a scuffle with Metts. He went over to grab Rodriguez, and the two walked away. Miranda said that they were stopped by police and after the field lineup he told officers, "to be honest . . . I hit the kid in self-defense."

During Miranda's testimony, defense counsel attempted to introduce the photograph of the surveillance video into evidence, and a bench conference was held. The State argued that if Miranda introduced the photograph, it should be allowed to call Officer Gazelle in rebuttal to give context as to what the photograph showed and what was in the video. The court stated that it agreed. Miranda's counsel responded that the photograph's purpose was to show the area where the incident happened, there was no dispute as to the photograph's accuracy, and testimony would not be elicited about any actions depicted in the photograph. Rather, the photograph was to explain the area and to show who was pictured in it. The court ruled that the officer would be allowed to testify as to the video's contents if the photograph was introduced, noting that its introduction would be prejudicial without the officer's testimony and that Miranda was not even in the picture. Counsel replied, "Right, that supports our defense." The court stated it had ruled.

12

Miranda was then shown the photograph. The photograph fairly and accurately depicted the front of the ABC store, Miranda stated, and Metts, Rodriguez, and Vargas were pictured, but he was not. Rodriguez was holding a hat in the photograph, Miranda testified, and Rodriguez had been wearing the hat prior to the photograph being taken and as they passed the ABC Store.

After Miranda's testimony, the State called Officer Gazelle as a rebuttal witness. Defense counsel objected to the testimony as hearsay and disputed that the introduction of the photograph had opened the door to Gazelle's testimony. The court overruled the objection, and Officer Gazelle testified that he viewed surveillance video capturing the time frame from about 11:30 p.m. until 11:34 p.m. The officer testified that at some point during the video, Metts, Smith, Miranda, Rodriguez, and Vargas appeared, and that Miranda and Rodriguez seemed to be "calling out Metts and Smith." The officer explained that Miranda's and Rodriguez' body language was "more forward" and they had "clenched fists" while Metts and Smith put their hands up at some points and their body language indicated that they did not want trouble. Miranda approached Metts and Rodriguez approached Smith, the officer testified, and at some point, Metts had his hands up and stepped to the side, and Miranda threw a punch toward Metts. At a different point Rodriguez threw a punch at Smith. The officer could not recall whether

Miranda or Rodriguez threw the first punch. After the initial punches were thrown, bystanders began to intervene and broke up the fight. Miranda, Rodriguez, and Vargas walked away, but Miranda returned about thirty seconds later and punched Metts one time before walking away again. The officer saw at least three, maybe four, punches being thrown in the video, and that at least two of the punches hit Metts and at least one punch hit Smith.

Officer Gazelle testified that he was rushed when he was watching the video and was not in control of the rewinding, fast-forwarding, pausing, or stopping of the video while he watched. The officer acknowledged that his report included only three sentences about the surveillance video, he had testified to some facts that were not in his report, and he wrote in his report that the photograph depicted "the moment before Rodrigues punched Metts' face." Officer Gazelle testified, however, that he did not now remember if Rodriguez actually threw the punch or not. The officer said that he did not recall taking any notes while he watched the video, he did not remember seeing any shoulder bump in the video, and he did not know how the argument began.

At the close of the evidence, the court instructed the jury as to accomplice liability.[6] Defense counsel objected to this instruction as submitted to the jury, arguing that it misstated the law as set out in applicable precedent.[7]

The jury found Miranda guilty as charged. Subsequently, Miranda filed a motion to set aside the verdict and enter a judgment of acquittal or in the alternative for a new trial (motion to set aside the verdict). At the hearing on the motion, defense counsel maintained that an investigator had contacted Hirata, the ABC employee, following the jury's verdict and learned that Hirata did not receive, and had never received, any administrative subpoena relating to the security video. The

---

[6]    The accomplice instruction read as follows:

> A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.
> A person is an accomplice of another in the commission of an offense with the intent -- if, with the intent to promote or facilitate the commission of the offense, he aids or agrees or attempts to aid the other person in the planning or commission of the offense.
> Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to an offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

[7]    During jury deliberations the court received two jury communications regarding the accomplice liability instruction. In its first communication to the court, the jury asked: "Reference page 39. Could you please clarify accomplice." The court's reply instructed the jury to "Please refer to your jury instructions." In its second communication, the jury asked: "Is it required to first establish whether or not the defendant caused the substantial bodily injury before we consider the accomplice provision?" The court replied: "Please consider your instructions as a whole."

15

court denied the motion, concluding that the defense had opportunities to contact Hirata both prior to and during trial but failed to do so.

On July 12, 2017, the circuit court sentenced Miranda to four years of probation (circuit court judgment).  Miranda timely appealed the circuit court judgment to the Intermediate Court of Appeals (ICA).

## II.  ICA PROCEEDINGS

Miranda argued before the ICA that the circuit court erred, inter alia, in precluding the defense from cross-examining Metts on the Marine Corps' code of conduct and for allowing Officer Gazelle to testify as to the contents of the security video.  The ICA concluded that Miranda had been given a constitutionally adequate opportunity to demonstrate to the jury any bias or motive to lie Metts may have had because the jury knew that Metts was a marine at the time of the incident, that the Marine Corps has a code of conduct, and that the code provides that marines should not become overly intoxicated.[8]  The ICA also noted that Metts was no longer in the military at the time of trial and that any bias he may have had with respect to his military career was no longer relevant.  Additionally, the ICA held that the admission of Officer Gazelle's testimony about

_____

[8] The ICA's memorandum opinion can be found at State v. Miranda, No. CAAP-17-0000660, 2019 WL 5099617 (App. Oct. 11, 2019) (mem.).

16

the contents of the video was not erroneous. The ICA stated that defense counsel was warned that introduction of the photograph would open the door to the testimony, the evidence at trial showed that the video was lost and thus supported the testimony's admission, and Miranda had not proven that the video was lost in bad faith.[9]

### III. STANDARDS OF REVIEW

#### A. Relevance of Evidence

A trial court's determination regarding the relevance of evidence is a conclusion of law. Walsh v. Chan, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995). Conclusions of law are reviewed de novo under the right/wrong standard of review. State v. Lavoie, 145 Hawai'i 409, 421, 453 P.3d 229, 241 (2019) (citing Maria v. Freitas, 73 Haw. 266, 270, 832 P.2d 259, 262 (1992)).

#### B. Constitutional Questions

Questions of constitutional law are reviewed de novo under the right/wrong standard. State v. Ui, 142 Hawai'i 287, 292, 418 P.3d 628, 633 (2018) (quoting State v. Friedman, 93 Hawai'i 63, 67, 996 P.2d 268, 272 (2000)).

---

[9] Additionally, Miranda appealed the denial of his pre-trial motion to dismiss, the instruction given to the jury on accomplice liability, and the denial of the post-trial motion to set aside the verdict. The ICA also affirmed the circuit court rulings as to these points of error.

## IV.    DISCUSSION

### A.    The Violation of Miranda's Right of Confrontation Deprived Him of a Fair Trial.

#### 1. The Circuit Court Erred in Precluding Cross-Examination on the Source of Metts' Potential Bias.

The sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution guarantees an accused the right to confront adverse witnesses.  State v. Balisbisana, 83 Hawai'i 109, 115, 924 P.2d 1215, 1221 (1996). "Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination[,] . . . [and] the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination."  Id. (alterations in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)).  Additionally, Hawai'i Rules of Evidence (HRE) Rule 609.1(a) (2016) provides that the "credibility of a witness may be attacked by evidence of bias, interest, or motive."  This court has established that "bias, interest, or motive is always relevant under HRE Rule 609.1."  State v. Levell, 128 Hawai'i 34, 40, 282 P.3d 576, 582 (2012) (brackets omitted) (quoting State v. Estrada, 69 Haw. 204, 220, 738 P.2d 812, 823 (1987)).

Our decisions have displayed a commitment to protecting an accused's constitutional right to demonstrate the

bias or motive of a witness in cross-examination.  In Balisbisana, the defendant was charged with abuse of a family or household member.  83 Hawai'i at 111, 924 P.2d at 1217.  The trial court excluded reference to the complainant's conviction for harassing the defendant, and the defendant was subsequently convicted.  Id. at 112-13, 924 P.2d at 1218-19.  On appeal, we held that the trial court's exclusion of the prior conviction violated the defendant's right to confront the witness and expose evidence of the complainant's motive for bringing false charges against him.  Id. at 113-16, 924 P.2d at 1219-22.  This court explained that the appropriate inquiry is whether "the jury had sufficient information from which to make an informed appraisal of [the complaining witness's] motives and bias, absent evidence of her conviction for harassing [the defendant]."  Id. at 116, 924 P.2d at 1222.  In not permitting defense counsel "to expose the fact from which the jurors could appropriately draw inferences relating to [the complainant's] motive or bias," we concluded that the trial court abused its discretion as "a reasonable jury might have received a significantly different impression" of the complainant's credibility.  Id.

In State v. Marcos, the defendant, who was convicted of abuse of a family or household member, was not allowed to cross-examine the complaining witness about a pending family

19

court case concerning the custody of their child. 106 Hawai'i 116, 117-20, 102 P.3d 360, 361-64 (2004). On appeal, the defendant argued that the complaining witness had a motive to fabricate the allegations against him and that his right to cross-examine the complainant to demonstrate motive was violated. Id. at 117, 102 P.3d at 361. In vacating the ICA's affirmance of defendant's conviction, we held that the defendant's right of confrontation was violated as "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on complainant's testimony." Id. (brackets omitted).

In Levell, we again confirmed "the appropriate inquiry is whether the trier of fact had sufficient information from which to make an informed appraisal of the witness's motives and bias." 128 Hawai'i at 40, 282 P.3d at 582. In that case, the defendant, who was charged with harassment for allegedly shoving the complainant, was not permitted to cross-examine the complainant as to whether she had stolen and used the defendant's credit cards after his arrest. Id. at 35, 40, 282 P.3d at 577, 582. The ICA upheld the conviction. On review, this court concluded that the defendant's constitutional right to confront the witness had been violated. Id. We explained that if the defendant had been allowed to ask about the alleged

theft, he might have elicited testimony tending to show that the complainant was biased or motivated to fabricate or exaggerate a story about harassment, which may have affected the trial court's view of the complainant's testimony and, ultimately, whether the State had proven its case. Id.

In State v. Acacio, the defendant was convicted of terroristic threatening based on a domestic dispute between the defendant and his ex-girlfriend, the complaining witness. 140 Hawai'i 92, 94, 398 P.3d 681, 683 (2017). The trial court precluded the defense from cross-examining the complainant with regard to her knowledge of the defendant's immigration status. Id. The defense had sought to show that the complainant knew that the defendant could be deported if he was arrested and her desire to have him deported motivated her to exaggerate or fabricate her allegation. Id. at 101, 398 P.3d at 690. On appeal, the ICA affirmed the conviction, holding the jury had sufficient information to appraise the credibility of the complaining witness because the court permitted evidence that the complainant wanted the defendant out of the house and that she was angry with him for not leaving when asked and before speaking to police. Id.

On certiorari review, this court held that the trial court's exclusion of this evidence violated the defendant's right to confrontation. Id. We stated that the "cross-

examination of the complaining witness is not sufficient if the defendant is deprived of an opportunity to present evidence about the source of the complaining witness's potential bias or motive." Id. Since the complaining witness's knowledge of the defendant's immigration status may have motivated the complainant to fabricate the abuse allegation, the trial court's exclusion of the evidence prevented the jury from having sufficient information from which to make an informed assessment of the witness's bias or motive. Id.

These cases demonstrate that the appropriate inquiry when reviewing an alleged violation of a defendant's constitutionally protected right to demonstrate bias or motive is whether the trier of fact had sufficient information, including as to its source, from which to make an informed appraisal of the witness's potential motive and bias. See Acacio, 140 Hawai'i at 100-01, 398 P.3d at 689-90; State v. Brown, 145 Hawai'i 56, 61-62, 446 P.3d 973, 978-79 (2019) (complainant's probation status created a potential interest to shape her testimony that was different in nature than other admitted evidence). Once the defendant is afforded the threshold level of inquiry under the confrontation clause, the trial court may conduct a balancing test to weigh the probative value of any additional motive evidence against its potential

22

for undue prejudice. Acacio, 140 Hawai'i at 99, 398 P.3d at 688 ("[T]he trial court's discretion becomes operative 'only after the constitutionally required threshold level of inquiry has been afforded the defendant.'" (quoting Levell, 128 Hawai'i at 39, 282 P.3d at 681)).

In this case, Metts testified that he had been drinking at a bar immediately prior to the altercation, he was not drunk on the evening of the incident, and the altercation was initiated by a shoulder bump from Miranda's group. Metts also stated at trial that Miranda was the person who punched him and that he did not remember shoving anyone during the incident. Defense counsel questioned Metts about several inconsistent statements made to Det. Burger after the incident, including that Metts could not remember if it was Miranda or Rodriguez that hit him, whether he was hit twice, and whether he had shoved someone. Defense counsel then attempted to question Metts about his knowledge of the consequences he would be subjected to as a marine for violating its code of conduct on drinking alcohol. The State objected, and Miranda argued that the evidence went to Metts' bias and motive. The court stated that it would not allow inquiry into this area because there was no evidence that Metts was overly drunk that night. The court sustained the objection, thus precluding the defense from

questioning Metts as to his knowledge of any consequences he might have suffered as a marine with regard to his alcohol consumption. Defense counsel then sought to question Metts as to the code of conduct's provisions on fighting. The court sustained the State's objection before Metts could respond to the question.

Defense counsel's questions sought to show that Metts had an interest or motive to be untruthful in his statements to police in order to avoid military discipline for his conduct with regard to alcohol consumption and fighting. The source of this motive was Metts' awareness of the consequences he would be subject to as an enlisted marine for engaging in prohibited conduct with regard to drinking and fighting.

The circuit court entirely precluded cross-examination as to the code of conduct with regard to fighting. The jury had heard conflicting testimony during trial about who was responsible for instigating the argument, whether Metts shoved anyone, and how many punches were thrown. However, the jury did not receive any testimony about Metts' knowledge of the discipline that may have been triggered for fighting. Awareness of the conduct proscribed by the code of conduct regarding fighting, that may have motivated Metts to exaggerate Miranda's participation in instigating the fight and minimize his own culpability to avoid disciplinary consequences, might have

affected the jury's view of the veracity of Metts' testimony. In other words, without knowing what Metts knew or believed regarding the consequences for violating the code of conduct as to fighting, the jury was not presented with the "source" of Metts' potential bias, and it therefore had insufficient information from which to make an informed appraisal of Metts' motives and biases.  Acacio, 140 Hawai'i at 101, 398 P.3d at 690; Brown, 145 Hawai'i at 61-62, 446 P.3d at 978-79.

The ICA nevertheless concluded that Miranda was given an adequate opportunity to demonstrate Metts' bias because the jury was informed that Metts was a marine, the Marine Corps has a code of conduct, and the code proscribes becoming "overly intoxicated."  The ICA's analysis did not discuss the circuit court's preclusion of cross-examination as to provisions in the code of conduct regarding fighting, except to say that any motive Metts would have had to deflect responsibility for the fight would have been apparent to the jury.  But any assumption by the ICA that the jury would have necessarily inferred there were provisions in the code of conduct concerning fighting would be flawed because the defense was not allowed to elicit this evidence.  Moreover, such an inference would not have informed the jury as to the source of Metts' motivation to shape his testimony because defense counsel was prevented from eliciting

testimony regarding Metts' awareness of the consequences he would face for violating provisions of the code of conduct for fighting.  Had defense counsel been allowed to elicit Metts' knowledge of such consequences, the jury might have been left with a different impression about whether Metts had an incentive to minimize his actions to avoid punishment.  The ICA's reliance on evidence that did not disclose the source of Metts' bias or motive was therefore error.  See Brown, 125 Hawai'i at 61-62, 446 P.3d at 978-79 ("Giving a defendant 'considerable latitude' during cross-examination of the complaining witness is not sufficient if the defendant is deprived of an opportunity to present evidence about the source of the complaining witness's potential bias or motive." (brackets omitted) (quoting Acacio, 140 Hawai'i at 101, 398 P.3d at 690)).

The ICA also concluded that because Metts was no longer in the military at the time of trial, any motive or bias he may have had at the time of the incident was no longer at issue.  However, any motive to fabricate or exaggerate statements that Metts may have had at the time of the incident is clearly relevant to the veracity of statements he made at that time, as is an intent or natural inclination to provide trial testimony consistent with his prior statements although he was no longer serving in the military.

Accordingly, the circuit court erred in precluding the defense from asking Metts about his knowledge of the code of conduct regarding fighting and the potential consequences that a marine would be subject to for violation of its provisions. Because Miranda was not given an opportunity to present evidence about the source of Metts' potential bias or motive, Miranda was not afforded "the threshold level of inquiry required under the confrontation clause" that would have provided the jury with sufficient information from which to make an informed decision of Metts' "'motives and bias' as to [his] testimony." Brown, 145 Hawai'i at 62, 446 P.3d at 979. Thus, Miranda's right to confront adverse witnesses to show bias, interest, or motive under article I, section 14 of the Hawai'i Constitution was violated, and the ICA erred in affirming the circuit court's ruling on this issue.[10]

## 2. The Error Was Not Harmless Beyond a Reasonable Doubt.

The denial of a defendant's constitutional right to impeach the credibility of a witness is subject to harmless error review. Acacio, 140 Hawai'i at 102, 398 P.3d at 691. "In

---

[10] In light of our resolution, we do not address the circuit court's restriction of cross-examination regarding provisions in the code of conduct as to drinking. Additionally, because we conclude that Miranda was not provided the threshold level of inquiry required under the confrontation clause, no further inquiry is required regarding application of HRE Rule 403. Acacio, 140 Hawai'i at 101 n.3, 398 P.3d at 690 n.3 (noting that this step in the analysis is not necessary when the threshold level of inquiry under the confrontation clause is not met).

applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Id. (quoting State v. Pond, 118 Hawaiʻi 452, 461, 193 P.3d 368, 377 (2008)). Several factors may be considered in determining whether a violation of a defendant's constitutional right to impeach was harmless, including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. (quoting Levell, 128 Hawaiʻi at 42, 282 P.3d at 584).

Metts testified that the incident was instigated by Miranda's group, the group was making derogatory arguments toward them, and he did not recall shoving anyone. Miranda stated that Metts and Smith engaged his group first, Metts was making threatening remarks, and he hit Metts in self-defense. Metts' testimony therefore stood in direct conflict with Miranda's explanation that he acted in self-defense.

While two other witnesses presented testimony of what happened during and after the incident, neither witness provided

28

evidence as to how the altercation was initiated.  Wight stated that he became aware of the incident when he heard yelling and that he witnessed the punch soon after he turned around from about 50 feet away.  Officer Gazelle testified that he did not know how the argument began and did not recall seeing a shoulder bump in the video.  The officer had only seen the video once, two years prior, and did not take any notes while watching the video.  Additionally, there were several conflicting accounts as to the number of punches thrown, the types of punches thrown, the persons who threw the punches, and the number of times Metts was hit.[11]  As such, Metts' account of how the incident began and unfolded was crucial to rebutting Miranda's self-defense testimony, and the case essentially turned on the credibility of Metts and Miranda.

Because the jury's perception of Metts' credibility could have been affected by the knowledge of a potential bias or motive to fabricate or shape his testimony, there is a

---

[11]  Metts testified that he was hit once and did not remember if he was hit twice.  However, in a recorded interview with Det. Burger played for the jury, Metts stated he was hit twice.  Miranda stated he had only hit Metts once and that he was aiming for Metts' nose.  Dr. Beckham testified that Metts said he had been hit twice and that Metts had suffered fractures to his jaw and nose, which could be consistent with being hit once or more than once.  Wight testified that he saw Miranda "uppercut" Metts once and that Miranda cocked back his fist as if he were going to strike Metts once more, but he did not punch Metts again.  Officer Gazelle stated that the video showed Metts getting punched at least two times and Smith getting punched at least once and that he did not remember whether Rodriguez also threw any punches, although he acknowledged that his report stated he "took a screenshot depicting the moment before Rodrigues punched Metts face."

reasonable possibility that the circuit court's error might have contributed to Miranda's conviction. The error was therefore not harmless beyond a reasonable doubt.

## B. The Circuit Court Erred in Determining that Miranda "Opened the Door" to Testimony about the Contents of the Surveillance Video.[12]

Miranda argues that the circuit court erred in finding that the introduction of the photograph "opened the door" to Officer Gazelle's testimony regarding the surveillance video.

This court has stated that the doctrine of "opening the door" is essentially a rule of expanded relevancy.[13] State v. Lavoie, 145 Hawai'i 409, 422, 453 P.3d 229, 242 (2019) (quoting State v. James, 677 A.2d 734, 742 (N.J. 1996)). Pursuant to this doctrine, when one party presents inadmissible evidence to the jury, the opposing party is permitted to adduce pertinent evidence that would otherwise be inadmissible in order to rebut the improperly introduced evidence. Id. The extent of this doctrine is limited, and it does not allow a party to

---

[12]    Although we conclude that the violation of Miranda's right to cross-examine the witness denied him a fair trial, we consider the admission of the testimony about the contents of the video to address the ICA's analysis and to provide guidance in the event the issue arises in subsequent proceedings.

[13]    This rule has also been referred to as the doctrine of "curative admissibility" or "fighting fire with fire." State v. Fukusaku, 85 Hawai'i 462, 497, 946 P.2d 32, 67 (1997). This court has not determined whether to adopt the doctrine. State v. Lavoie, 145 Hawai'i 409, 424, 453 P.3d 229, 244 (2019) ("[E]ven if we were to adopt the doctrine of curative admissibility, it would not be applicable to the present case." (quoting Fukusaku, 85 Hawai'i at 497, 946 P.2d at 67)).

adduce inadmissible evidence for the purpose of rebutting inferences raised by the introduction of admissible evidence. Id. at 422-23, 453 P.3d at 242-43 ("Admissible evidence therefore does not 'open the door' to otherwise inadmissible evidence." (citing State v. Middleton, 998 S.W.2d 520, 528 (Mo. 1999))); State v. Fukusaku, 85 Hawai'i 462, 497, 946 P.2d 32, 67 (1997) (holding that defense counsel did not "open the door" to the introduction of inadmissible evidence by eliciting admissible evidence).

In this case, defense counsel sought to admit the photograph Officer Gazelle took of the security video into evidence. As an offer of proof, counsel stated that the picture was an accurate depiction of the sidewalk where the altercation occurred on the night of the incident. The State maintained that the introduction of this picture would open the door to testimony as to the rest of the video but did not dispute that the picture accurately depicted the scene, and Miranda testified that the picture was a fair and accurate representation of the scene. It is well-settled that a photograph of the scene should be admitted so long as a witness who is familiar with the scene and competent to testify verifies the photograph as an accurate representation of the scene at the time in question. Territory v. Hays, 43 Haw. 58, 65 (Haw. Terr. 1958); State v. Sequin, 73 Haw. 331, 338, 832 P.2d 269, 273 (1992) (affirming trial court's

exclusion of a photograph that did not accurately depict the relevant area).  The photograph was thus admissible evidence of the appearance of the area where the altercation occurred on the night of the incident.  Additionally, Officer Gazelle's police report stated that the photograph depicted the moment before Rodriguez punched Metts' face, and its admissibility was not disputed at trial.  Because Miranda was not attempting to introduce inadmissible evidence but instead admissible photographic evidence of the scene, the "opening the door" doctrine is not applicable.[14]

It is noted that the prosecutor and the court appeared to be concerned that the photograph would be misleading to the jury as it only represented a single snapshot of the entire incident and Miranda was not shown in the photograph.  The concerns of the prosecutor and the court could have been addressed by providing a cautionary instruction.  See, e.g., Hawai'i Standard Jury Instruction Criminal 2.01 Cautionary Instruction--Recess ("[K]eep an open mind until all the evidence has been presented, the Court has instructed you on the law that applies in this case and final arguments have been given.");

---

[14]     Because we find that the opening the door doctrine is inapplicable in this case, we do not reach the issue of whether this court should adopt the doctrine.  See Lavoie, 145 Hawai'i at 424, 453 P.3d at 244; Fukusaku, 85 Hawai'i at 497, 946 P.2d at 67.

2.04 Cautionary Instruction During Trial Regarding Transcript of a Recording.  The prosecutor could have requested and the court could have fashioned a cautionary instruction that, for example, informed the jury that the photograph depicted a single snapshot of the entire incident and the jury must consider the weight to be given to the photograph in light of all the other evidence that was admitted for its consideration.

While we conclude that defense counsel did not open the door to Officer Gazelle's testimony regarding the surveillance video, the State argues, and the ICA appears to have concluded, that the evidence was nevertheless admissible under HRE Rule 1004 (2016).  Under HRE Rule 1004(1), "The original or a duplicate is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if . . . . [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."  We have previously held that testimony can serve as a duplicate of an original under HRE Rule 1004.  State v. Espiritu, 117 Hawai'i 127, 135, 176 P.3d 885, 893 (2008).  Here, Officer Gazelle and Det. Burger testified that they attempted to get a copy of the surveillance video but were unsuccessful, and there was no evidence that the surveillance video was destroyed in bad faith.  Additionally, Officer Gazelle's testimony as to what he viewed in the video was other evidence of the contents

of a recording. See Espiritu, 117 Hawai'i at 135, 176 P.3d at 893 (stating testimony about the contents of a destroyed text message was admissible under HRE Rule 1004 as other evidence). The government accordingly satisfied the criteria for admission of the testimony under HRE Rule 1004.

But because the circuit court allowed Officer Gazelle to testify regarding the contents of the video based on its ruling that the defense had opened the door to this testimony, it appears that the circuit court did not consider and did not make any determination on the record as to whether the evidence should have been excluded under HRE Rule 403 (2016). HRE Rule 403 "applies to all evidence." State v. Plichta, 116 Hawai'i 200, 231 n.15, 172 P.3d 512, 543 n.15 (2007) (Acoba, J., dissenting); United States v. Chapman, 765 F.3d 720, 726 n.1 (7th Cir. 2014) ("[Federal Rule of Evidence (FRE)] Rule 403 applies to all evidence[.]"); HRE Rule 403. The rule itself provides that otherwise admissible evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." HRE Rule 403. Here, one critical determination in the admission of the testimony of the contents of the video was whether the probative

34

value of the evidence was substantively outweighed by its danger of unfair prejudice to Miranda.[15]

Officer Gazelle testified about the contents of the four-minute video that he viewed once two years earlier. The officer testified that he was rushed when he was watching the video and was not in control of the rewinding, fast-forwarding, pausing, or stopping of the video while he watched. Officer Gazelle's testimony was the only evidence of the contents of the video besides the single photograph of the video taken by the officer. While Officer Gazelle's testimony regarding his recollection of the video clearly has probative value, it served as essentially an eyewitness account by a law enforcement officer of the entirety of the incident, potentially raising concerns that the evidence would be unfairly prejudicial.

This concern is compounded by the fact that Miranda appeared to have been hampered in cross-examining the officer about the video's contents. There is no contention that defense counsel had viewed the video prior to it being destroyed, and counsel was without any other effective means--such as

---

[15] "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." HRE Rule 403 cmt. (quoting Advisory Committee's Note to Federal Rules of Evidence 403); see also State v. Rosario, 966 A.2d 249, 259 (Conn. App. Ct. 2009) ("Unfair prejudice exists when the evidence tends to have some adverse effect upon [the party against whom the evidence is offered] beyond tending to prove the fact or issue that justified its admission into evidence." (alteration in original)).

contemporaneous notes or a detailed report--to determine if there were inconsistencies with the officer's recollection and the video or to cross-examine the officer to show that he might have misremembered, embellished, or omitted facts in recounting the video's contents.[16]

On remand, the court should evaluate the admissibility of the officer's testimony of the video's contents under HRE Rule 403.[17]

---

[16] See, e.g., United States v. Brown, No. 08-0098, 2009 WL 2338112, at *2 (W.D. Pa. July 29, 2009) (reasoning that it would be "extremely difficult" for defense counsel to cross-examine the witnesses about a video viewed four years prior because "counsel [had] not viewed the video and [did] not have any other objective account of the content of the tape with which to compare" and concluding that the probative value of the evidence was outweighed by the danger of unfair prejudice and other FRE 403 considerations); United States v. Ortiz, No. 11-251-08, 2013 WL 101727, at *5 (E.D. Pa. Jan. 7, 2013) (holding that it was not unfairly prejudicial for two witnesses to testify about their recollection of a deleted video recording because the witnesses had created contemporaneous notes and reports at the time they watched the video recording, allowing defense counsel to effectively cross-examine the witnesses); Olabisi v. Farmington Ave. Prof'l Bldg., LLC, No. CV095028880S, 2012 WL 1139190, at *4 (Conn. Super. Ct. Mar. 19, 2012) ("[T]he witness had viewed the videotape . . . over four years before the trial.  It would have been extremely difficult for the plaintiff's attorney to cross-examine her regarding her testimony about what was on the videotape when he had no opportunity to view it and no means to verify that the tape was in truth a tape of the plaintiff's activities on the day of the incident.").

[17] Miranda also argues that the ICA erred in holding that the loss of the video did not violate his right to a fair trial.  At trial, Officer Gazelle and Det. Burger testified that they attempted to retrieve the video but were unsuccessful, and the video was ultimately written over.  While Miranda cites a declaration by Hirata submitted post trial seeming to contradict these statements, Hirata did not testify at the pre-trial hearing on the motion to dismiss, during trial, or during post-trial motions.  The record therefore does not establish that the State's delay caused the loss of the evidence.  See State v. Dunphy, 71 Haw. 537, 543, 797 P.2d 1312, 1315-16 (1990) (holding that the prejudice to the defendant's defense was caused by the loss of tapes due to the police department's unreasonable delay).  The issue may be subject to further hearing on remand.  Further, we conclude that Hirata's declaration did not provide "new evidence" such that the circuit

(continued . . .)

## V.    CONCLUSION

Based on the foregoing, we vacate the ICA's judgment on appeal and the circuit court judgment and remand the case to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Dwight C.H. Lum<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Chad M. Kumagai<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

(. . . continued)

court erred in denying his motion to set aside the verdict and enter a judgment of acquittal.

In light of our disposition, it is unnecessary to address whether there was sufficient evidence to support an accomplice instruction and whether the accomplice instruction was consistent with our law on accomplice liability.  We also reject Miranda's argument subsumed within his questions presented in his application for writ of certiorari that there was insufficient evidence to support his conviction based upon our review of the evidentiary record viewed in the most favorable light to the State.  See State v. Williams, 146 Hawaiʻi 62, 76, 456 P.3d 135, 149 (2020) ("The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." (quoting State v. Richie, 88 Hawaiʻi 19, 33, 960 P.2d 1227, 1241 (1998))).